## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

---

| | |
|---|---|
| BRUCE KAATZ,<br>      PLAINTIFF,<br><br>- V - | CASE NO.  23-CV-10604<br><br>HON. LAURIE J. MICHELSON |
| KINGSBROOK M.H.C., LLC<br>(d/b/a "KINGSBROOK ESTATES<br>MHC, LLC"),<br>KINGSBROOK MHC-MICHIGAN LLC<br>(d/b/a "KINGSBROOK ESTATES<br>MHC, LLC"),<br>         AND<br>MADELEINE STANFIELD<br>      AND<br>KELLY MAGAR,<br>         AND<br>HEATHER VIEHMAN<br>      DEFENDANTS. | MAGISTRATE JUDGE KIMBERLY<br>G ALTMAN<br><br>PLAINTIFF'S MOTION TO ENTER<br>DEFAULT JUDGEMENT AGAINST<br>DEFENDANTS STANFIELD AND<br>MAGAR |

---

**Plaintiff's Attorney:**
LEGAL SERVICES OF EASTERN MICHIGAN
Steven E. Shelton (P68652)
Nikola Lucic (P79706)
Counsel for Plaintiff
436 S. Saginaw Street
Flint, MI 48502
Telephone: 810-991-4820
Fax: 810-553-9824
Email: SShelton@LSEM-MI.org

**Defendants' Attorneys:**
*For Kingsbrook Estates MHC, LLC;*
*Kingsbrook MHC-Michigan, LLC;*
*and Heather Viehman:*
Janet Swistak (P24831)
Swistak Levine, P.C.
30833 Northwestern Highway
Suite 120
Farmington Hills, MI 48334
Telephone: 248-851-8000
Email: jswistak@swistaklevine.com

*For Madeleine Stanfield*
*(Defendant In Pro Per):*
Madeleine Stanfield
770 Suffield Lane
Almont, MI 48003

*For Kelly Magar*
*(Defendant In Pro Per):*
Kelly Magar
2810 Viewfield Lane
Almont, MI 48003

## PLAINTIFF'S MOTION TO ENTER DEFAULT JUDGEMENT AGAINST DEFENDANTS STANFIELD AND MAGAR

Plaintiff Bruce Kaatz, through his attorney, Steven Shelton of Legal Services of Eastern Michigan, in accordance with the provisions of Fed. R. Civ. P. 55(b)(2), moves this Court for entry of a default judgment as to defendants Madeleine Stanfield and Kelly Magar, upon the complaint heretofore filed and served upon the defendants.

This motion is based on the following grounds:

1. On March 14, 2023, Plaintiff filed a Complaint alleging violations of the Fair Housing Amendments Act of 1988, 42 U.S.C. § 3601 et seq. ("FHAA") and the Michigan Persons with Disabilities Civil Rights Act, M.C.L. §§ 37.1501-37.1507 ("PWDCRA").

2. Defendant Stanfield was served a copy of said Complaint and Summons by certified mail, restricted delivery, return receipt requested in accordance with Fed. R. Civ. P. 4 and MCR 2.105(A)(2) on March 20, 2023.

3.  Defendant Magar was personally served a copy of said Complaint and Summons on June 5, 2023.

4.  On April 14, 2023, after more than 21 days had elapsed since the service of said Complaint and Summons upon Defendant Stanfield, and no Answer thereto having been filed or served by Defendant Stanfield upon Plaintiff's counsel, Plaintiff requested through his counsel that a default be entered against Defendant Stanfield.

5.  The requested default was entered against Defendant Stanfield by the clerk that same day.

6.  On July 11, 2023, after more than 21 days had elapsed since the service of said Complaint and Summons upon Defendant Magar, and no Answer thereto having been filed or served by Defendant Magar upon Plaintiff's counsel, Plaintiff requested through his counsel that a default be entered against Defendant Magar.

3

7. The requested default was entered against Defendant Magar by the clerk the following day.

8. Defendants Stanfield and Magar have failed to plead or otherwise defend this action, and Plaintiff is entitled to judgment by default against both of these defendants.

9. Pursuant to Fed. R. Civ. P. 55(b)(2), this Court is empowered to enter a default judgment against these defendants for relief sought by Plaintiff in his complaint.

10. Written notice of this Motion has been given to both Defendants as set forth in the attached affidavit.

11. As required by the Servicemembers Civil Relief Act of 2003, I have confirmed that the defendants are not currently in active military service.

12. To my best information and belief, neither defendant is an infant or incompetent person.

13. The claim of the Plaintiff is for damages to compensate Plaintiff for economic losses and damages, personal injuries, pain and suffering,

and noneconomic injuries, such as emotional distress, loss of civil rights, and humiliation and embarrassment caused by the Defendants' violations of the FHAA and PWDCRA.

14. Plaintiff's counsel has calculated the damages referenced in Paragraph 13 (above) at $20,000.00.

15. Plaintiff also seeks an award of punitive and/or exemplary damages under the FHAA as a result of Defendants' deliberate, intentional, willful and flagrant handicap discrimination, in an amount that reflects the dual purposes of punishment and deterrence.

16. Plaintiff's counsel has calculated the damages referenced in Paragraph 15 (above) at $10,000.00 per defendant.

17. Plaintiff also requests pre-judgment and post-judgment interest on all awards rendered.

18. These awards are based upon the facts pleaded in the Complaint, the attached Affidavit in Support of Motion to Enter Default Judgement, and the factors elaborated upon in the attached Brief in Support of this motion.

**WHEREFORE,** for all of the above reasons and those listed within the Brief in Support of this Motion, Plaintiff Bruce Kaatz respectfully requests that the Court grant the following relief for Plaintiff Bruce Kaatz and against Defendants Stanfield and Magar:

(A)     An award of $20,000.00, jointly and severally, as compensation for Plaintiff's economic losses and damages, personal injuries, pain and suffering, and noneconomic injuries, such as emotional distress, loss of civil rights, and humiliation and embarrassment caused by the Defendants' violations of the FHAA and PWDCRA;

(B)     An award of $10,000 against each defendant individually as punitive and/or exemplary damages under the FHAA as a result of Defendants' deliberate, intentional, willful and flagrant handicap discrimination, reflecting the dual purposes of punishment and deterrence;

(C)     Pre-and post-judgement interest from the date of filing of the Complaint; and

(D)     Grant such other and additional relief that the Court finds just and appropriate under the circumstances.

Respectfully submitted,


LEGAL SERVICES OF EASTERN MICHIGAN
Counsel for Plaintiff


By: /s/ Steven Shelton (P68652)
436 S. Saginaw Street, Suite 101
Flint, MI 48502
810-991-4820
Fax: 810-991-4820
Dated:  October 4, 2023       Email: SShelton@LSEM-MI.org

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | |
|---|---|
| BRUCE KAATZ,<br>        PLAINTIFF,<br><br>- V -<br><br><br>KINGSBROOK M.H.C., LLC,<br>KINGSBROOK MHC-MICHIGAN<br>LLC, MADELEINE STANFIELD,<br>KELLY MAGAR,  AND<br>HEATHER VIEHMAN<br>        DEFENDANTS. | CASE NO.  23-CV-10604<br><br>HON. LAURIE J. MICHELSON<br><br><br>MAGISTRATE JUDGE KIMBERLY<br>G ALTMAN<br><br>BRIEF IN SUPPORT OF<br>PLAINTIFF'S MOTION TO ENTER<br>DEFAULT JUDGEMENT AGAINST<br>DEFENDANTS STANFIELD AND<br>MAGAR |

**Plaintiff's Attorney:**
LEGAL SERVICES OF EASTERN MICHIGAN
Steven E. Shelton (P68652)
Nikola Lucic (P79706)
Counsel for Plaintiff
436 S. Saginaw Street
Flint, MI 48502
Telephone: 810-991-4820
Fax: 810-553-9824
Email: SShelton@LSEM-MI.org

**Defendants' Attorneys:**
*For Kingsbrook Estates MHC, LLC;*
*Kingsbrook MHC-Michigan, LLC;*
*and Heather Viehman:*
Janet Swistak (P24831)
Swistak Levine, P.C.
30833 Northwestern Highway
Suite 120
Farmington Hills, MI 48334
Telephone: 248-851-8000
Email: jswistak@swistaklevine.com

*For Madeleine Stanfield*
*(Defendant In Pro Per):*
Madeleine Stanfield
770 Suffield Lane
Almont, MI 48003
*For Kelly Magar*
*(Defendant In Pro Per):*
Kelly Magar
2810 Viewfield Lane
Almont, MI 48003

## BRIEF IN SUPPORT OF PLAINTIFF'S
## MOTION TO ENTER DEFAULT JUDGEMENT AGAINST
## DEFENDANTS STANFIELD AND MAGAR

Plaintiff Bruce Kaatz, through his attorney, Steven Shelton of Legal Services of Eastern Michigan, in accordance with the provisions of Fed. R. Civ. P. 55(b)(2), moves this Court for entry of a default judgment as to defendants Madeleine Stanfield and Kelly Magar, upon the complaint previously filed and served upon the defendants, and offers this brief in support.

## ISSUES PRESENTED

The only issue before the Court is the amount of damages to which Plaintiff is entitled as a result of Defendants' refusal to allow a "reasonable accommodation" under the Fair Housing Amendments Act of 1988, 42 U.S.C. § 3601 et seq. ("FHA" or "FHAA") and the Michigan Persons with Disabilities Civil Rights Act M.C.L.A. § 37.1501 et seq. ("PWDCRA"), thus violating Plaintiff's rights under these statutes.

## CONTROLLING AUTHORITY

*Statutes, Regulations, and Court Rules*

- Fair Housing Amendments Act of 1988, 42 U.S.C. § 3601 *et seq.* ("FHA" or "FHAA")

- Michigan Persons with Disabilities Civil Rights Act, M.C.L.A. § 37.1501 *et seq.* ("PWDCRA")

- 24 CFR 100.204

- 24 CFR 180.671(a)

- Fed. R. Civ. P. 55

*Caselaw*

- *Anderson v City of Blue Ash*, 798 F3d 338 (CA 6, 2015)

- *BMW of North America v Gore*, 517 US 559; 116 S Ct 1589; 134 L Ed 2d 809 (1996)

- *Fustok v Conticommodity Servs, Inc*, 873 F2d 38 (CA 2, 1989)

- *United States v Gant*, 268 F Supp 2d 29 (DDC, 2003)

- *HUD v. Sams*, 1994 HUD ALJ LEXIS 74 (HUDALJ Mar. 11, 1994)

- *Secretary, HUD v Collier*, ____F App'x____; 2019 U.S. App. LEXIS 2102 (CA 11, Jan. 22, 2019)

- *Secretary, HUD v Woodard*, 2016 HUD ALJ LEXIS 4 (2016)

- *Nitzkin v One Reliance LLC*, ____F Supp 3d____; 2022 U.S. Dist. LEXIS 68388 (ED Mich, Apr. 13, 2022)

3

- *Justice v Pendleton Place Apartments*, 40 F3d 139 (CA 6, 1994)

- *Spica v Schrotenboer*, ____NW2d____; 2015 Mich. App. LEXIS 496 (Ct App, Mar. 12, 2015)

- *Stokes v Cetner*, ____F Supp 2d____; 2000 U.S. Dist. LEXIS 2162 (ED Mich, Jan. 28, 2000)

- *Thomson v Wooster*, 114 US 104; 5 S Ct 788; 29 L Ed 105 (1885)

- *TXO Prod Corp v Alliance Resources Corp*, 509 US 443; 113 S Ct 2711; 125 L Ed 2d 366 (1993)

- *In re Visioneering Constr*, 661 F2d 119, 124 (CA 9, 1981)

**STATEMENT OF FACTS**

Plaintiff Bruce Kaatz is a 71-year-old man who resides in a mobile home with his minor child. This home is, and for approximately 15 years has been, located at the "Kingsbook Estates Mobile Home Community" (hereinafter "Kingsbrook Estates") in Almont, Michigan. "Kingsbrook Estates" is actually owned and operated by two LLCs: Defendants Kingsbrook M.H.C., LLC and Kingsbrook MHC-Michigan, LLC. Defendant Stanfield and Defendant Magar were both employees of Kingsbrook Estates during all of the time periods that apply in this case, and each was at one time during these events a manager of the mobile home community in question.

As part of his lease, Plaintiff Kaatz is assigned two reserved parking spots directly in front of his home. Approximately 12 years ago, Plaintiff Kaatz began having various problems with his back and legs, and had to undergo several surgeries. As a result of these surgeries, Plaintiff Kaatz suffers from mobility issues and became disabled. At times, he has to use a cane, walking stick, or other mobility device. These disabilities make it difficult for Plaintiff to get in and out of his vehicle, especially when he is bringing in groceries or helping his young son in and out of the car. They also make it excruciatingly painful for him to walk long distances. To make these things easier, Plaintiff Kaatz began parking so that his vehicle was centered between his two parking spots, giving him extra room

5

to get in and out of his vehicle. He parked in this manner for years without incident, problem, or complaint.

In September, 2022, Kingsbrook Estates began repaving their streets and informed residents that they would need to park by the office (roughly a quarter mile away) or in the parking spots of vacant sites. Plaintiff Kaatz notified Defendants at that time that he had a disability that made walking difficult and needed to reserve a parking spot near his home (i.e., one of the parking spots on vacant sites) for this reason. Defendant Stanfield (the manager at the time) denied him this accommodation, and Plaintiff contacted Heather Viehman, the regional manager for Kingsbrook Estates. Ms. Viehman left a voicemail for Plaintiff acknowledging that Plaintiff Kaatz has a disability but that in her view, "there is room for you to comfortably walk from your home to any of the parking areas that have been offered to you, so no other accommodations are going to be made."

The paving project took approximately three weeks. During that time, Plaintiff was forced to park primarily at the office and walk roughly a quarter-mile each way to and from his home, using a walking stick and/or cane. These walks caused Plaintiff to suffer extra pain in his knees and back, and he needed to stop halfway to his house and lean on something for a few minutes before he could continue. By the time he got back to his house, he was in excruciating pain

6

and ready to collapse. On these occasions, he could not do anything for the rest of the day, even spend time with his son. He had pain medication that he took, but it provided insufficient relief. He eventually had to call his doctor because of the inflammation of his knees. They could not see him for several days, during which time he had to get by with using ice to reduce the swelling and pain. Ultimately, they had to give him injections in his knees. This helped reduce the pain, but did not completely relieve it.

Once the paving project was completed, Kingsbrook Estates designated one parking spot on the street in front of Plaintiff's home as a "handicap parking" spot. This "handicap parking" spot is at the end of the street, significantly further away from Plaintiff's home than his existing parking spots. It is also not reserved for any particular person.

On or about October 9, 2022, a Kingsbrook Estates maintenance man had a conversation with Plaintiff about the parking, for the first time indicating a problem with the way that Plaintiff had been parking for approximately a dozen years. When Plaintiff asked if the handicap spot was reserved or if anyone could park in it, this employee told Plaintiff that it was not reserved, adding "and you'd better park in your f***ing parking spot and not on both of them!"

On October 25, 2022, Plaintiff Kaatz received a "violation" for "double parking" because he had parked as previously described. Plaintiff texted

Defendants about the violation and the maintenance man's use of vulgar language in front of Plaintiff's child that same day, indicating again that he needed an accommodation for his mobility-related disabilities. He reminded them that he pays for these parking spots as part of his lot rent and asked (again) that he be allowed to "double park" (as he had been doing for years without issue) to accommodate his disability.

Plaintiff received a series of texts and emails back shortly thereafter from Defendant Magar and Defendant Viehman, stating that the way he had been parking is "double parking and that is not allowed", and that he does not "pay for the spots, you rent them", and there is a handicap spot where he could park so "the violations will not change." As noted: the handicap spot is further away and not reserved for anyone, so it is not always available. Kingsbrook Estates also does not clear the sidewalks in the winter, so for weeks at a time, it is completely inaccessible to Plaintiff.

Plaintiff Kaatz followed up on October 31, 2022 by emailing a request for an accommodation, specifically stating that he needs extra room getting in and out of his vehicle, and asked to be allowed to do this as an accommodation for his disability. To support his reasonable accommodation request, he provided Defendants with a copy of an October 28, 2022 letter from his neurologist that stated Plaintiff was being treated for mobility issues related to his "multiple back

and neck conditions" and required parking in a "handicap parking spot or . . . a wider parking spot for his multiple conditions."

Defendant Magar responded to Plaintiff via email saying "there is a handicap spot at the end of the sidewalk that you are more than welcome to use" and said they are hoping to get another one next to it soon. Defendant Magar cited Plaintiff for another "double parking" violation that same day, and stated to Plaintiff that if he received a third violation, that he would be evicted.

As a result, Plaintiff was frightened that he and his son would lose their home. Because of his disabilities, Plaintiff would have no way of moving anything. He suffered from constant stress, anxiety (as discussed in further detail, *infra*). After suffering through this for weeks, Plaintiff had to resort to taking prescribed Xanax to deal with both the emotional distress and the physical pain that he was still suffering as a result of the aggravation done to his injuries during the paving project.

On November 7, 2022, Plaintiff made another request for an accommodation through counsel (Attorney Steven Shelton of Legal Services of Eastern Michigan). Defendant Magar refused to give the accommodation, merely repeating that Plaintiff could use the handicap spot that is further away from his home and that was all she was willing to do for him. She then referred counsel to Kingsbrook Estates' counsel.

Attorney Shelton's attempts to reach an agreement through Defendants' counsel spanned the course of several months, but are not particularly relevant to the instant motion, which concerns only Defendants Stanfield and Magar. It should be noted that Plaintiff's counsel provided numerous additional letters from Plaintiff's physicians, including the letter from Plaintiff's neurologist; an additional letter from Plaintiff's Physician's Assistant ("PA") at Henry Ford Medical Center, stating specifically that because of Plaintiff's disability, "He is to be allowed to park in the middle of his 2 parking spots ('Double Park'), as he needs extra room to get in and out of his car"; and another letter from Dr. Kenneth Scott on December 7, 2022 stating that "He needs an extra wide parking space so that he can get into and out of his car because of his mobility issues. He also needs a parking space as close as possible to his front door." Defendants remained intransigent, and Defendants' counsel eventually refused to even return messages from Plaintiff's counsel.

It was not until March 14, 2023—when Plaintiff filed this lawsuit and received a Temporary Restraining Order requiring them to let him double-park without penalty—that Plaintiff got any relief from the emotional distress caused by having the threat of homelessness hanging over his head.

Both Defendant Stanfield and Defendant Magar were properly served in accordance with Fed. R. Civ. P. 4 and MCR 2.105. Neither Defendant took any

action to appear in or defend this case. Upon Plaintiff's request through his counsel, defaults were properly entered against both Defendants.

The remaining Defendants have negotiated a settlement agreement with Plaintiff, which is pending. This motion applies only to Defendant Magar and Defendant Stanfield.

## ARGUMENT

### I.    Default Judgement Procedural Requirements

Under Fed. R. Civ. P. 55(A), "When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." If the amount of damages sought is not a "sum certain" that can be calculated to a certainty, then Fed. R. Civ. P. 55(b)(2) specifies that "[t]he court may conduct hearings or make referrals—preserving any federal statutory right to a jury trial—when, to enter or effectuate judgment, it needs to: (A) conduct an accounting; (B) determine the amount of damages; (C) establish the truth of any allegation by evidence; or (D) investigate any other matter."

Both Defendant Stanfield and Defendant Magar failed or refused to file an Answer or otherwise appear in or defend this case. As a result, default

11

judgements were entered against both. Because the damages sought by Plaintiff are not a "sum certain" that can be easily calculated, the Court must determine the amounts of these damages. Whether or not this requires a hearing is within the Court's discretion: "Although the court must ensure that there is a basis for the damages specified in a default judgment, it may, but need not, make the determination through a hearing. Rather . . . the court may rely on detailed affidavits or documentary evidence . . . to evaluate the proposed sum." *Fustok v Conticommodity Servs, Inc*, 873 F2d 38, 40 (CA 2, 1989). *See also, United States v Gant,* 268 F Supp 2d 29, 32 (DDC, 2003) (noting that a Court may conduct a hearing, but is not required to do so if there is a basis for the damages specified in the pleadings); *Nitzkin v One Reliance LLC*, ____F Supp 3d____; 2022 U.S. Dist. LEXIS 68388, at *3 (ED Mich, Apr. 13, 2022) ("Rule 55 does not require a presentation of evidence as a prerequisite to the entry of a default judgment, although it empowers the Court to conduct such hearings as it deems necessary and proper").

Plaintiff contends in this matter that no hearing is necessary, as the well-pleaded allegations contain a basis for damages, as does the attached Affidavit in Support. *Thomson v Wooster*, 114 US 104, 111; 5 S Ct 788; 29 L Ed 105, 107 (1885) (holding that when a default is entered against a defendant, the allegations in the Complaint are "taken to be true in all matters alleged with

12

sufficient certainty"); *In re Visioneering Constr*, 661 F2d 119, 124 (CA 9, 1981) ("Well pleaded allegations of the petition, including jurisdictional averments, are taken as admitted on a default judgment.") Ultimately, of course, it is up to the Court to decide if a hearing is necessary.

## II.     Standard for Determining Damages

"The statutory scheme of the Fair Housing Act provides for a cause of action and a damages remedy." *Justice v Pendleton Place Apartments*, 40 F3d 139, 143 (CA 6, 1994). This include both "actual and punitive damages" under 42 U.S.C. § 3613(c). Plaintiff Kaatz is entitled to both.

### A. Actual Damages

"Actual damages are compensatory damages. Compensatory damages include: 1) economic loss (out-of-pocket loss and other monetary harms) and 2) non-economic loss (emotional distress for humiliation, hurt, mental anguish, and 'intangible dignitary interests'). . . . Proof of mental anguish or emotional distress does not have to include medical testimony and it may consist of the plaintiff's testimony, alone, as corroborated by reference to the circumstances of the alleged misconduct." *Stokes v Cetner*, ____F Supp 2d____; 2000 U.S. Dist. LEXIS 2162, at *3-4 (ED Mich, Jan. 28, 2000) (internal citations omitted).

13

Plaintiff Kaatz is not requesting economic damages in this matter. He is, however, requesting non-economic compensatory damages for pain, suffering, mental anguish, humiliation, and emotional distress. As noted in the pleadings and the attached Affidavit in Support of Motion to Enter Default Judgement, Plaintiff has a long history of medical conditions that make walking difficult and painful, especially over long distances. Complaint, ¶¶ 29-31; Affidavit in Support of Motion for Entry of Default Judgement, ¶ 5. Defendants knew about this, and even acknowledged it. Complaint, ¶¶ 35-41; Affidavit, ¶¶ 7-11. Nonetheless, they denied his request to have a spot reserved for him as close as possible to his home so that he could minimize how far he had to walk during their repaving project. No reason was given for this; there was no claim that it was an undue burden, nor would it be one, since the requested accommodation would cost them nothing. Comments from Defendant Viehman seemed to indicate that this denial was some sort of punishment for Plaintiff complaining about the condition of the road. As a result, Plaintiff was forced to walk nearly a quarter-mile to and from his house to get to his vehicle for approximately three weeks. Complaint, ¶¶ 43-44; Affidavit, ¶¶ 13-14. This caused Plaintiff to unnecessarily suffer significant aggravation to his disabilities, resulting in excruciating pain that eventually required medical treatment: "These walks caused me to suffer extra pain in my knees and back, and I needed to stop halfway to my house and

lean on something for a few minutes before I could continue. By the time I got back to my house, I was in excruciating pain and ready to collapse. I could not do anything for the rest of the day, even spend time with my minor son. I had pain medication that I took, but it was not sufficient. I had to call my doctor because my knees were so inflamed. They could not get me in for days, so I had to just use ice on it to try to reduce the swelling and pain. Eventually, they had to give me injections in my knees, which helped but did not completely erase the pain." Id, ¶ 14.

After the construction project was done, Defendants continued to not only refuse Plaintiff his requested accommodations, but to also punish him for asserting his rights. As discussed *supra*, Defendants arbitrarily started issuing Plaintiff Kaatz violations for "double parking" (parking between his two reserved spots, as he had done for years, to give him extra space to get in and out of his car). Repeated requests—supported by documentation—to be allowed this simple accommodation were met only with hostility, indifference, and a directive to park in the "handicap spot at the end of the sidewalk", which is further away from Plaintiff's home than his reserved spots, is open for public use, and is inaccessible during the winter. Complaint, ¶¶ 45-50; Affidavit, ¶¶ 17-20. On October 31, Plaintiff emailed yet another request for a reasonable accommodation, this time accompanied by medical documentation. Ms. Magar

responded by denying his request and issuing another, clearly retaliatory violation for "double parking". This violation came with a threat: if he received another violation, they would evict him. Complaint, ¶¶ 55-62; Affidavit, ¶¶ 24-28.

The threat of being evicted shocked Plaintiff; he is over 70 years old with multiple debilitating disabilities and would have no way to pack up boxes, let alone furniture, to move. Plaintiff's stress over this fear manifested in ways both physical and mental:

> When I got the second violation and was told that if I got a third one, they would evict me, I was frightened that my son and I would lose our home. Because of my disabilities, I have no way to move anything. I suffered from constant stress and anxiety: I could barely eat or sleep, and when I could sleep I had nightmares; I had constant upset stomach; I constantly worried about us becoming homeless; I felt embarrassed and humiliated that I was on the brink of homelessness; and I became depressed, nervous, and irritable. My son kept asking me what was going on and why I was upset, and I tried to explain it to him as well as I could, but he is really too young to understand. Trying to explain this to my six-year-old to relieve his obvious concern over my stress and anxiety only made things worse.

Affidavit, ¶ 29. Plaintiff Kaatz eventually had to resort to taking prescription Xanax to treat both the mental anguish and the physical pain that lingered on from the extra distance he was forced to walk during the repaving project. Affidavit, ¶ 30.

16

This denial of Plaintiff's rights continued even after he obtained counsel, with Defendant Magar flippantly telling counsel that Plaintiff could use the handicap spot and that was all they would do for him. Complaint, ¶¶ 63-64. No accommodation was made at all until this Court issued a Temporary Restraining Order in March, 2023. Affidavit, ¶ 35.

Damages for pain, suffering, emotional distress, and the like are always difficult to determine, because to determine an appropriate amount of damages, one must quantify the unquantifiable. "When assessing noneconomic damages, it should be remembered that 'a dollar amount can never truly be placed on an individual's pain and suffering,' and consequently, noneconomic damages are an 'imprecise' means of compensation." *Spica v Schrotenboer*, ___NW2d___; 2015 Mich. App. LEXIS 496, at *12 (Ct App, Mar. 12, 2015) (internal citations omitted). For this reason, it is often helpful to look at other cases for guidance, bearing in mind that "no two persons sustain the same injury or experience the same suffering." *Id (quoting Freed v Salas*, 286 Mich App 300, 336, 336; 780 NW2d 844 (2009) *and  Precopio v Detroit*, 415 Mich 457, 471; 330 NW2d 802 (1982)). The Court has wide discretion to set an emotional distress damages award based upon the consideration of two factors: (i) the egregiousness of Respondent's behavior and (ii) the effect of that behavior on Complainant. *HUD v. Sams*, 1994 HUD ALJ LEXIS 74, at *25 (HUDALJ Mar. 11, 1994). "[E]gregious

17

emotional distress claims generally involve either outrageous or shocking discriminatory conduct or a significant impact on the physical health of the plaintiff." *Secretary, HUD v Collier*, ____F App'x____; 2019 U.S. App. LEXIS 2102, at *19-20 (CA 11, Jan. 22, 2019) *(*quoting *Olsen v. Cty. of Nassau*, 615 F. Supp. 2d 35, 47 (E.D.N.Y. 2009).

In the instant case, it is quite clear that Defendants Stanfield and Magar engaged in shocking, outrageous, and egregious behavior: although they were fully aware of Plaintiff Kaatz's age and disabilities, they chose to force him to walk longer than necessary distances to punish him for complaining about the roads, arbitrarily denied him the accommodation he had used without issue for 12 years, and then punished him for requesting that the accommodation be reinstated by issuing violations, eventually threatening to evict him.

The effects of these actions has already been discussed *supra*, but bear repeating: the extended walks during the repaving project caused him excruciating pain, ultimately requiring additional medical treatment, that lasted for weeks; and he experienced extreme anxiety over the prospect of he and his child becoming homeless, so much so that he had to resort to taking Xanax (prescribe by his doctor) to deal with it. It also strained his relationship with his son, and caused him anguish over his son's anxiety and being unable to effectively explain why he was depressed, anxious, and irritable.

Based on both the egregiousness of the behavior by Defendants Stanfield and Magar, and the effect of these actions on Plaintiff's health (both physical and mental), Plaintiff requests $20,000.00 in damages for his physical pain and suffering, anxiety, emotional distress, and other mental anguish as described *supra*. This award is consistent with other awards in similar cases.

For example, the plaintiff in *Huss v King Co*, ____F Supp 2d____; 2001 U.S. Dist. LEXIS 19293, at *42 (WD Mich, Nov. 14, 2001), the court found, "an outwardly healthy person in no obvious distress" who had "suffered a back injury, which has caused him pain, and which may continue to cause him occasional pain in the future", and who had endured "one surgical procedure" as a result, although it was unlikely that he would undergo more. In that case, the Court found that "the reasonable value of plaintiff's past pain and suffering and loss of enjoyment of life is $25,000." *Id*, 43.

In *Arnold v Wilder*, 657 F3d 353 (CA 6, 2011), the plaintiff was illegally arrested by a police officer who put her in a chokehold, hit her head against the glass in his police cruiser's window, and pepper sprayed her while she was in the back of the police car. *Id,* 359. Ultimately, "the jury awarded Arnold $2,400 for physical injury including pain and suffering, $5,000 for legal expenses, $50,000 for mental pain and suffering, and $1,000,000 in punitive damages." *Id,* 362.

19

It should be noted that both of these cases are ten to twenty years old. The amount of these judgements in 2023 would likely be substantially higher due to inflation adjustment.

FHA violations adjudicated and/or settled through HUD are also published and provide insight. In a 2019 housing discrimination case, the court entered "an award of $3,000 for Complainant's emotional distress", even though she "failed to sufficiently articulate the nature and duration of her emotional distress", but the record showed that the discrimination she suffered was, at the very least, "the cause for some modicum of emotional distress." *Secretary, HUD v Collier*, ____F App'x____; 2019 U.S. App. LEXIS 2102, at *22 (CA 11, Jan. 22, 2019). This award did not include any damages for physical pain and suffering.

A 2016 case in which the Complainant suffered housing discrimination because of a disability (in this case, mental illness) saw the court award $20,000 in damages for "emotional distress" (again without any award for physical pain and suffering). *Secretary, HUD v Woodard,* 2016 HUD ALJ LEXIS 4, *1. The court noted that "Complainant entered an extended period of severe depression and anxiety. . . . After the incident, Complainant experienced bouts of crying, anger, emotional and physical withdrawal, and loss of motivation." *Id*, *11-12.

### B. Punitive Damages

"Punitive damages include egregious discrimination, wilful and wanton conduct disregarding a person's rights, and deterrence. The Supreme Court has created three guideposts to assist courts in determining the reasonableness of a punitive damage award: 1) the degree of reprehensibility of the defendant's conduct; 2) the ratio of punitive damages to compensatory damages; and 3) a comparison of the punitive damages award to civil or criminal penalties that could be imposed for comparable misconduct." *Stokes*, *supra*, at *4-5 (internal citations omitted).

### Reprehensibility of the Defendants' Actions

The willful and wanton conduct, and the degree of reprehensibility of the Defendants' conduct, has already been addressed, *supra*. Clearly, the Defendants engaged in unacceptable and shocking behavior that not only violated Plaintiff Kaatz's rights under the FHA and PWDCRA, but also resulted in substantial injury. Neither has expressed any remorse.

### Ratio to Compensatory Damages

"The principle that exemplary damages must bear a 'reasonable relationship' to compensatory damages has a long pedigree." *BMW of North America v Gore*, 517 US 559, 580; 116 S Ct 1589; 134 L Ed 2d 809, 829 (1996). "Punitive damages should bear a reasonable relationship to the harm *that is*

21

*likely to occur from the defendant's conduct* as well as to the harm that actually has occurred. If the defendant's action caused *or would likely cause* in a similar situation only slight harm, the damages should be relatively small. If the harm is grievous, the damages should be much greater." *TXO Prod Corp v Alliance Resources Corp*, 509 US 443, 460; 113 S Ct 2711; 125 L Ed 2d 366, 380-81 (1993) (emphasis in original) (quoting *Garnes v Fleming Landfill*, 186 W Va 656, 668; 413 SE2d 897 (1991)).

In the instant matter, the actions of Defendants Stanfield and Magar caused significant injury to Plaintiff Kaatz—both physical and mental—when they violated his rights. Although perhaps not "egregious" to the point of causing a death or dismemberment, their actions were likely to cause the exact injuries that Plaintiff suffered.

*Deterrence*

Plaintiff acknowledges that "deterrence" in this case is a less important factor, as neither defendant is still employed by Kingsbrook Estates. In fact, as Plaintiff understands it, Defendant Stanfield has retired and Defendant Magar is not currently working in property management. Nonetheless, she may do so again at some point, and there needs to be a lesson here that violating someone's rights under the FHA is not funny, nor is it a "technicality" of some sort: it is serious and has serious consequences for the victims, and should have equally

22

serious consequences for the perpetrator. Furthermore, "deterrence" is not limited to "deterrence" for just the Defendants; it is also a warning to others who may wish to engage in similar conduct of the consequences they could face.

*Comparison to Civil or Criminal Penalties*

Had this case been adjudicated through HUD, additional civil penalties could have been imposed on Defendants *in addition to* damages (both compensatory and punitive) payable to the Plaintiff. The maximum for a first offense is $24,793. 42 USC 3612(g)(3). (The statute lists a $10,000 maximum for a first offense, but this amount is modified annually for inflation under the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, 28 USCS § 2461. As of 2022—when the bulk of the incidents in this case occurred— the maximum had been adjusted to $23,011. For 2023, the amount has been adjusted upward to $24,793. 24 CFR 180.671(a).)

Under the totality of the circumstances, Plaintiff Kaatz requests punitive damages of $10,000.00 each against both Defendant Stanfield and Defendant Magar. This amount—under half of the maximum civil penalty—appropriately reflects the egregiousness of the Defendants' behavior, is not disproportionate

23

compared to the actual damages, and should serve as an effective deterrent to both the Defendants and anyone else who chooses to engage in similar conduct.

## CONCLUSION

Plaintiff Kaatz was the target of egregious discrimination on the basis of his disability, and suffered significant physical pain and emotional anguish as a result. Not only did Defendants Stanfield and Magar treat his rights and his suffering as not worthy of serious consideration, but they treated this case the same way by failing to take any action to address or defend the allegations. It is time for them to get a wake-up call.

**WHEREFORE,** for all of the above reason, Plaintiff Bruce Kaatz respectfully requests that the Court grant the following relief for Plaintiff Bruce Kaatz and against Defendants Stanfield and Magar:

(A)   An award of $20,000.00, jointly and severally, as compensation for Plaintiff's economic losses and damages, personal injuries, pain and suffering, and noneconomic injuries, such as emotional distress, loss of civil rights, and humiliation and embarrassment caused by the Defendants' violations of the FHAA and PWDCRA;

(B)   An award of $10,000 against each defendant individually as punitive and/or exemplary damages under the FHAA as a result of Defendants' deliberate, intentional, willful and flagrant handicap discrimination, reflecting the dual purposes of punishment and deterrence;

(C)   Pre-and post-judgement interest from the date of filing of the Complaint; and

24

(D)     Grant such other and additional relief that the Court finds just and appropriate under the circumstances.


Respectfully submitted,


LEGAL SERVICES OF EASTERN MICHIGAN
Counsel for Plaintiff


By: */s/ Steven Shelton* (P68652)
436 S. Saginaw Street, Suite 101
Flint, MI 48502
810-991-4820
Fax: 810-991-4820
Dated:  October 4, 2023          Email: SShelton@LSEM-MI.org