# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

Bruce A. Kaatz,
    Plaintiff,

- v -

Kingsbrook M.H.C., LLC, et al
    Defendants.

Case No. 23-cv-10604

Hon. Laurie J. Michelson
Magistrate Judge Kimberly G Altman

## AFFIDAVIT IN SUPPORT OF MOTION
## TO ENTER DEFAULT JUDGEMENT

Bruce Kaatz being first duly sworn, deposes and says:

1. My name is Bruce Kaatz.

2. I over 18 years of age, make the following statements from personal knowledge, and could testify as such in a court of law.

3. I have been a resident at Kingsbrook Estates Mobile Home Park in Almont, Michigan for approximately 15 years. This location is owned and operated by MHC, LLC.

4. My lot rent includes two parking spaces, both located directly in front of my home and next to each other.

5. I became disabled in 2009, and have had a number of surgeries to treat this disability. Unfortunately, this disability has resulted in a loss of mobility and the surgeries have not been able to correct this, and I need to use a cane or other mobility devices. Walking is painful and tiring for me, especially over long distances.

6. In September, 2022, Kingsbrook Estates began repaving their streets and informed residents that they would need to park by the office (roughly a quarter mile away) or in the parking spots of vacant sites.

7. At that time, I told Madeleine Stanfield (who was the manager at the time) that I am disabled and requested that they reserve a parking spot for me in one of the vacant parking spaces as close as possible to my home to minimize the distance I would have to walk. Ms. Stanfield denied this request.

8. I attempted to call Heather Viehman, the regional manager for Kingsbrook Estates, but was unable to leave a message.

9. Ms. Stanfield must have said something to her, because she called back and left me a voicemail message.

10. In this voicemail, Ms. Viehman seemed annoyed. She said I had previously complained about the condition of the road and she said Kingsbrook Estates was paying an "exhorbitant amount of money" to "appease residents like yourself", and said "to be honest, you are the only person who has had an issue with parking."

11. Ms. Viehman told me in the voicemail that she knows I am disabled but "there is room for you to comfortably walk from your home to any of the parking areas that have been offered to you, so no other accommodations are going to be made."

12. The project was not completed until October 9, 2022.

13. During the approximately three-week period of the construction (September 19, 2022 through October 9, 2022), I was forced to park primarily at the office and walk approximately one-quarter mile each way to and from my vehicle using a walking stick or cane.

14. These walks caused me to suffer extra pain in my knees and back, and I needed to stop halfway to my house and lean on something for a few minutes before I could continue. By the time I got back to my house, I was in excruciating pain and ready to collapse. I could not do anything for the rest of the day, even spend time with my minor son. I had pain

2

medication that I took, but it was not sufficient. I had to call my doctor because my knees were so inflamed. They could not get me in for days, so I had to just use ice on it to try to reduce the swelling and pain. Eventually, they had to give me injections in my knees, which helped but did not completely erase the pain.

15. The repaving work was finished during the first or second week of October, 2022.

16. Because of my disabilities, I require extra space on either side of my vehicle so that I can get in and out, as well as get my minor child in and out of his car seat, and perform other common tasks.

17. To accommodate this, I have for several years parked my vehicle in the middle of the two adjoining parking spots (so that the dividing line is in the middle of my car), providing me the extra room that I need to get in and out of the car.

18. On or about October 9, I was told by Stan Stanfield, the Kingsbrook Estates maintenance man, that I was no longer going to be allowed to park in this manner, and that I "better park in [my] f***ing parking spot and not on both of them" from now on.

19. Soon thereafter, I received an email from Kelly Magar, who I believe was the assistant property manager at the time, confirming that I would no longer be allowed to park where I had been parking and that "there is a handicap spot at the end of the sidewalk that you are more than welcome to use".

20. The handicap spot in question is at the very end of the sidewalk, significantly further away than the two spots directly in front of my house that I pay for and that are reserved for my use. Using the handicap spot would actually make it more difficult for me to leave and return.

21. On October 25, 2022, Ms. Magar sent me a violation for "double parking"

22. I texted both Ms. Magar and Ms. Viehman regarding the violation and the language used by Mr. Stanfield in front of my child. I reminded them that I pay for these parking spots as part of my lot rent and asked that I be allowed to "double park" (as I had been doing for years without issue) to accommodate my disability.

23. I received a series of texts back shortly thereafter, stating that the way I have been parking is "double parking and that is not allowed", and that I don't "pay for the spots, [I] rent them", so "the violations will not change."

24. On October 31, 2022, I emailed them letters from my doctors—both my doctor at Henry Ford hospital and my neurologist—stating that I am disabled and need this accommodation specifically because I need extra room getting in and out of my vehicle. (Exhibit 1, attached) The letter from my neurologist was sent to the office via email at management@kingsbrookestates.com.

25. The letter from my neurologist said that I was being treated for mobility issues related to my "multiple back and neck conditions" and required parking in a "handicap parking spot or . . . a wider parking spot for [my] multiple conditions."

26. Ms. Magar responded in an email saying "there is a handicap spot at the end of the sidewalk that you are more than welcome to use" and said they are hoping to get another one next to it soon.

27. Not only is this handicap parking spot further from my house, but it is not reserved for me and is not always available. Kingsbrook Estates also does not shovel their sidewalks, so walking to the handicap spot would be impossible for me when there is snow on the ground. As such, this did nothing to accommodate my needs.

28. That same day, Ms. Magar cited me a second time for "double parking" and told me that if I get a third violation, they would try to evict me.

29. When I got the second violation and was told that if I got a third one, they would evict me, I was frightened that my son and I would lose our

home. Because of my disabilities, I have no way to move anything. I suffered from constant stress and anxiety: I could barely eat or sleep, and when I could sleep I had nightmares; I had constant upset stomach; I constantly worried about us becoming homeless; I felt embarrassed and humiliated that I was on the brink of homelessness; and I became depressed, nervous, and irritable. My son kept asking me what was going on and why I was upset, and I tried to explain it to him as well as I could, but he is really too young to understand. Trying to explain this to my six-year-old to relieve his obvious concern over my stress and anxiety only made things worse.

30. Eventually, I had to start taking Xanax (prescribed by my doctor) to deal with both the emotional distress and the physical pain that I was still suffering as a result of the aggravation done to my injuries during the paving project.

31. On November 7, 2022, my attorney (Steven Shelton) contacted Ms. Magar and attempted to explain to her why I need this accommodation. She refused to discuss it with him, referring him to the company's attorney.

32. On November 9, 2022, Mr. Shelton sent a letter to the company's attorney (Jarrett Levine), explaining the situation and asking them to resolve the matter within 10 days. He included a copy of the letter from my doctor at Henry Ford.

33. The attorney's office did not respond for more than two weeks, and then repeatedly asked for more time to look into it. Mr. Shelton sent them my original letter from the neurologist, as well as an additional letter from my Physician's Assistant ("PA") at Henry Ford Medical Center, which stated specifically that because of my disability, "He is to be allowed to park in the middle of his 2 parking spots ('Double Park'), as he needs extra room to get in and out of his car". (Exhibit 2, attached.)

34. Neither Mr. Shelton nor I received any movement from Kingsbrook Estates for approximately two months, despite Mr. Shelton's repeated efforts to resolve the situation.

5

35. It was not until March 14, 2023—when I filed a lawsuit against Kingsbrook Estates, Ms. Stanfield, Ms. Magar, and Ms. Viehman and received a court order requiring them to let me double-park and ordering them not to evict me—that I got any relief from the emotional distress caused by

36. Throughout this whole ordeal, Ms. Magar, Ms. Stanfield, and Ms. Viehman showed a complete lack of empathy toward my pain and suffering, and even after the lawsuit was filed, Ms. Stanfield's granddaughter would scream obscenities at me as she and Ms. Stanfield drove by when I was outside. Ms. Stanfield did nothing to stop her, and seemed to be encouraging her. If anything, they seemed to be amused by my ordeal.

Further, affiant saith not.

_____
Bruce Kaatz

10-4-23
Date

{ Subscribed and sworn to before me this _4th_ day of _October_, 2023.

{ _____
Steven E. Shelton, Notary Public
{ Genesee County, Michigan

{ My Commission Expires: June 18, 2029